IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

MARK ALAN SHOEMAKER,            )
                                )
          Plaintiff,            )
                                )
-vs-                            )     CASE NO. CIV-23-202-J
                                )
QUINTESSA LLC, an Oklahoma      )
Limited liability company,      )
                                )
          Defendant.            )

DEPOSITION OF CRAIG ALINDER

TAKEN ON BEHALF OF THE DEFENDANT

VIA VIDEOCONFERENCE

ON MAY 9, 2024

REPORTED BY:  TRENA K. BLOYE, CSR

1             A P P E A R A N C E S
2
3
4    All parties appeared via videoconference.
5
6    For the Plaintiff:
7          MICHAEL SOFRIS
           ACTION LEGAL TEAM
8          13920 Northwest Passage, Suite 304
           Marina del Rey, California 90292
9          michaelsofris@gmail.com
           310-877-8828
10
11
     For the Defendant:
12
           BENJAMIN M. MCcASLIN
13         STRIDE LAW FIRM
           P.O. BOX 1407
14         Guthrie, Oklahoma 73044
           ben@stride.law
15
16
17   Also Present:
18         Mark Alan Shoemaker
19
20
21
22
23
24
25

Craig Alinder                                                May 9, 2024

Page 3

# TABLE OF CONTENTS

| CRAIG ALINDER | Page |
|---|---|
| Corporate representative | 5 |
|    Examination by Mr. McCaslin | 5 |
| Personal Capacity | 86 |
|    Examination by Mr. McCaslin | 86 |
| Jurat Page | 93 |
| Correction Sheet | 94 |
| Certificate | 95 |

# INDEX OF EXHIBITS

| Exhibit | Description | Page |
|---|---|---|
| Exhibit 1 | Lead Commission Agreement | 16 |
| Exhibit 2 | First Amended Complaint | 59 |
| Exhibit 3 | Assignment | 72 |
| Exhibit 4 | 10/1/23 Email | 73 |
| Exhibit 5 | 3/1/23 Email | 76 |
| Exhibit 6 | 3/16/23 Shoemaker Invoice | 78 |

* * * * * * * * *

Craig Alinder                                                    May 9, 2024

Page 4

**S T I P U L A T I O N S**

1
2
3
4    **IT IS HEREBY STIPULATED AND AGREED BY and**
5    **between the parties hereto, through their respective**
6    **attorneys, that the deposition of CRAIG ALINDER may be**
7    **taken on behalf of the Defendant on the 9th day of May,**
8    **2024, via videoconference, by Trena K. Bloye, Certified**
9    **Shorthand Reporter for the State of Oklahoma, by notice**
10   **pursuant to the Federal Rules of Civil Procedure.**
11
12
13
14
15                         * * * * *
16
17
18
19
20
21
22
23
24
25

Craig Alinder									May 9, 2024

Page 5

1          CRAIG ALINDER,
2   after having been first duly sworn at 11:02 a.m., deposes
3   and says in reply to the questions propounded as follows,
4   to wit:
5                       EXAMINATION
6   BY MR. McCASLIN:
7       Q   Would you please state your full, legal name.
8       A   Craig Henrich Alinder.
9       Q   Okay.  Alinder.  I wondering how to say it.  I've
10  heard it said Alinder, but it's Alinder.
11      A   It is Alinder.
12      Q   What is your date of birth?
13      A   March 25, 1976.
14      Q   Okay.  Mr. Alinder, have you ever given a
15  deposition before?
16      A   Nope.
17      Q   Have you ever testified in a court of law?
18      A   Nope.
19      Q   Okay.  Well, since this is the first time, I'll
20  walk through what I like to call the deposition preamble.
21  I'm sure your attorney probably gave you some advice on
22  sort of what to expect in this deposition.  But I will give
23  you a few things that we can try to keep in mind to try to
24  make our time here a little bit easier and to make our
25  transcript more accurate and to help out our court

1    Q   So is it your testimony the parties were not
2  operating in accordance with this written agreement?
3    A   No.  My testimony is we had a way of operating
4  that sometimes, that you highlighted were an agreement with
5  the agreement, and sometimes were in disagreement with
6  parts of the agreement.  So --
7    Q   Did --
8    A   I just know how we were operating.  This agreement
9  was signed in November of 2020 and we had a several-year
10 relationship that was evolving, and this agreement was
11 signed once.
12   Q   Did, to your knowledge, did Clear View and
13 Quintessa ever sign any subsequent written agreement that
14 had anything to do with this relationship?
15   A   Not to my knowledge.
16   Q   And if I understood your testimony correctly
17 earlier, you had testified that -- oh, sorry.  I did not
18 mean to move off of that.
19       If I understood your testimony earlier correctly,
20 you had stated that the emails and the text messages that
21 were exchanged between Quintessa and Clear View, that set
22 forth the specific commission prices for each law firm that
23 Clear View referred, was it your testimony that none of
24 those emails or text messages were signed by each of the
25 parties?

Craig Alinder																													May 9, 2024

Page 65

1    A    I don't know what it says, so I don't know.
2    Q    Okay.  Take a moment to review Count Two, if you
3  could.
4    A    I don't understand No. 19, but I get the gist of
5  Count Two.
6    Q    Okay.  Having reviewed Count Two, can you describe
7  for me what Clear View's position is on what facts were
8  negligently misrepresented to Clear View by Quintessa?
9    A    So Quintessa was supposed to provide monthly
10 statements of leads delivered to Dworkin, both commercial
11 and non-commercial --
12   Q    Okay.  Let's --
13   A    -- so we can understand what leads were delivered
14 on a month-to-month basis and also what was owed and what
15 was earned, and we never got any such statement.
16   Q    Okay.  You said Quintessa was supposed to deliver
17 those.  What creates that obligation?
18   A    The obligation to pay and --
19   Q    No, no --
20   A    -- and being the arbiter of the information,
21 they're the only ones who know how many leads were
22 delivered other than law firm itself.
23   Q    Are you aware of anything in the contract that
24 requires Quintessa to give a report to Clear View for each
25 lead that was delivered to Dworkin or any other law firm?

1   A   How would Dworkin or anyone know how many leads
2   were delivered if they didn't provide a report of how many
3   leads were delivered?
4   Q   Okay.  Well, what my question is does the contract
5   require Quintessa to give any sort of report or accounting
6   to Clear View?
7   A   Well, it requires the payment.  Or payment implies
8   an accounting.  How would you know how many leads were
9   delivered and they owed the X amount if you couldn't
10  provide how many leads were delivered in a given time?
11  It's implied, but there is no written requirement that I
12  see.  But how could they pay without an accounting.
13  Q   Okay.  So any other facts that you believe
14  Quintessa negligently misrepresented in connection with --
15  well, just negligently misrepresented to Clear View in
16  connection with this agreement?
17          MR. SOFRIS:  Yeah.  I have to object that
18  "negligent" may have a legal connotation.
19  A   Yeah.  I was going to ask the same thing.  I don't
20  know what negligently misrepresented, what the standard is
21  for that.
22  Q   (By Mr. McCaslin)  Yeah.  Let's strike out that
23  term negligent.
24          What other facts did Quintessa misrepresent Clear
25  View?

Craig Alinder                                                May 9, 2024

Page 67

1    A    I think it's primarily the quantity and substance
2  of the leads being delivered on a month-to-month basis to
3  the clients that we referred.
4    Q    What do you mean the quantity and the substance?
5    A    Well, substance being whether they were commercial
6  or non-commercial.  Quantity just being the number of
7  commercial and the number of non-commercial, because they
8  were -- they were billed differently.
9    Q    Okay.  So are you saying that Quintessa
10 misrepresented those things or just didn't give Clear View
11 the actual numbers at all?
12   A    They didn't give the numbers at all.  When --
13 yeah, so they didn't give the numbers at all.
14   Q    Okay.
15   A    So --
16   Q    So are there any other facts that Clear View
17 believes were misrepresented to it by Quintessa?
18   A    I have no way of knowing without something other
19 than their word for what happened.  So they -- so I
20 don't -- I don't have --
21   Q    Yeah.  And I --
22   A    If Quintessa would provide the accounting of the
23 leads delivered then we would know whether they were
24 misrepresented or not, because we were paid on a number.
25   Q    Yeah.  I understand that.  I'm asking you a very

Craig Alinder                                           May 9, 2024

Page 68

1    specific question.  Are you aware of any other facts that
2    Quintessa misrepresented to Clear View?
3         A    No.
4         Q    Okay.  How was Clear View damaged by the alleged
5    misrepresentations?
6         A    We were damaged financially primarily.
7         Q    Okay.  How so?  Could you explain it for me?
8         A    By not being paid for all leads that were
9    delivered or being provided, you know, an accounting of all
10   leads delivered so we would be confident that we were paid
11   for all leads delivered.
12        Q    Does Clear View contend that its damages stemming
13   from the misrepresentation differ from the damages that
14   it's claiming for the breach of contract claim?
15        A    I don't know what that means.  And Clear View
16   isn't suing Quintessa, so I --
17        Q    Yeah.
18        A    I don't have any contention of the kind.
19        Q    Okay.  Well, and we'll get to that here shortly.
20   But does Clear View think it has different damages for its
21   misrepresentation claim than the damages that it's claiming
22   for breach of contract?
23        A    Years of litigation and delay of payments that
24   were due years ago, you know, is a damage, yes.  It has
25   taken up time and energy.  You know, not being paid